IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOROUGHBRED LEGENDS, LLC, )
ET AL. )
 )
    Plaintiffs, )
 )      CIVIL ACTION
    v. )      FILE NO.: 1:07-CV-1275
 )
THE WALT DISNEY COMPANY, )
ET AL. )
 )
    Defendants. )

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO DEFENDANTS' AMENDED MOTION TO DISMISS

## I.    INTRODUCTION

Defendants claim they are entitled to dismissal of the Complaint under Rule 12 (b) (6). An examination of the operative Complaint[1] ("V. Compl.") makes clear that Defendants' motion does not come close to meeting the standards applicable to a Rule 12(b)(6) motion, and should be denied.

## II.    FACTUAL BACKGROUND

---

[1]Pursuant to Fed. R. Civ. P. 15 (a), Plaintiffs have filed a Verified First Amended Complaint as of right since no responsive pleading has been filed. Plaintiffs will thus respond to Defendants' motion based upon the allegations of the Amended Complaint.

The Amended Complaint asserts claims for federal and state service mark infringement and dilution; unfair competition; defamation; and violations of Georgia's common law tort of invasion of privacy, including false light and the wrongful appropriation and commercial exploitation of the names, likenesses and life stories of Plaintiffs Frank Whiteley, Jr. ["Whiteley"] and Jacinto Vasquez ["Vasquez"].

## A.    Rights in the Ruffian Service Mark

The extraordinary career of Ruffian is set forth in the Amended Complaint. She was trained by Whiteley and ridden in nine of her eleven races by Vasquez. Whiteley and Vasquez are part owners of the "Ruffian" mark. (V. Compl. ¶¶ 12-19; Exhibit "A").

To protect the rights in the "Ruffian" mark, on May 10, 2004, Plaintiff Thoroughbred Legends, LLC ["Legends"] filed and is the owner of two applications in the United States Patent and Trademark Office ["PTO'] for the mark "Ruffian." One of these applications, Serial No. 78415873, covers "Entertainment services, namely, production of theatrical plays, motion picture films, television shows, and documentaries."  The PTO has approved the application. (V. Compl. ¶¶ 3, 28).  On May 25, 2007, Legends filed a Statement of

Use in support of said application which included a specimen showing evidence of the Plaintiffs' advertisement and promotion of their services under the "Ruffian" mark which had been provided to persons in the media and entertainment business. The PTO accepted the Statement of Use, confirming that the advertisement supported use of the Ruffian service mark, and approved the mark for issuance of a federal registration.  A federal trademark registration for its Ruffian service mark can now issue at any time.[2]  (V. Compl. ¶28; Ex. H).

In addition to its federal trademark applications, Legends advertised and promoted their services under the Ruffian mark and have therefore acquired common law rights in the mark.  These activities have included advertising and promoting the mark to media and entertainment companies and their

---

[2]In their Brief, the Defendants "note" that "Ruffian" is also a registered mark of the New York Racing Association Inc.["NYRA"] for "entertainment in the nature of horseracing."  (The NYRA conducts a horse race named in honor of Ruffian.) Defendants point is irrelevant at best, and very misleading at worst.  It is well settled trademark law that trademark rights are not a right in gross, and only extend to the products or services identified by the subject mark. *See generally* J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:62 at 24-107 (4th ed. 1997).  Marks often exist in different fields without confusion.  *See In re Fesco, Inc.*, 219 U.S.P.Q. 437 (BNA) (T.T.A.B. 1983).  The two Ruffian marks co-exist, just as the "ABC" mark co-exists with the hundreds of other "ABC" trademarks.  Here, the PTO has concluded that both marks are simultaneously entitled to the benefits of federal trademark protection.

representatives, including the Defendant ESPN. (V. Compl. ¶¶29; Ex. G).  It is these rights which the Defendants have usurped.

**B.    Defendants' Infringement of the "Ruffian" Mark**

Disregarding the Plaintiffs' written notices of their rights in the Ruffian mark, Defendants aired a movie titled "Ruffian" on the ABC television network on June 9, 2007.  (V. Compl. ¶¶ 31-34).  They plan to do so again in October 2007. (V. Compl. ¶ 34).  The title of Defendants' movie, of course, is identical to the Plaintiffs' "Ruffian" mark.  The film provided the identical services to the identical customers through the same channels of trade identified in Plaintiffs' federal trademark registration.

**C.    The Amended Complaint Asserts Actionable Claims for the Torts of Defamation and Invasion of Privacy**

The Ruffian film has been billed by Defendants as a "true story," not as a work of fiction.  (V. Compl., Exhibit "F").  Yet, it is not a true story.  Among other things, it makes it appear as if Whiteley blackmailed Vasquez into riding Ruffian for the match race by threatening to never allow him to ride another of his horses if he did not do so.  It also makes it appear as if Vasquez was susceptible to blackmail.  (V. Compl. ¶¶ 41-45).

The film further makes Whiteley out to be an individual who would defy the ethical rules of horse racing by permitting an outsider, the journalist Bill Nack, whose character narrates the film, to be privy to highly confidential information about a horse he was training, including information about the horse's racing prospects and medical condition.   It is unethical in the horse industry to permit such access by third parties.  Moreover, by presenting Whiteley as someone who provided such access, it portrays his as someone who would violate the trust that the owners of the horse place in him for maintaining strict confidentiality about the horse.    (V. Compl. ¶¶ 46-49.)   These false statements by Defendants about Whiteley and Vasquez are alleged to be, and are, defamatory.

However, the movie does more.  It takes events which actually occurred between Whiteley and Vasquez, but casts these events in a false light.  Specifically, the film makes Whiteley out to be a racist - derogatorily calling Vasquez a "Puerto Rican" - when in fact this was always used as a term of endearment between the two, which Vasquez well understood.  Conversely, the film portrays Vasquez as one who did nothing in the face of racist slurs, when he never would have stood idly by in the face of such insults. (V. Compl. ¶¶ 51-56.)

Defendants further invaded the privacy of Whiteley and Vasquez by doing a film which exploits their names, their appearance, their speech and their mannerisms for commercial exploitation. Their images were exploited to give the film credibility and to create the impression that it was sponsored and supported by those closest to Ruffian in real life. (V. Compl. ¶¶ 57-60).

## III.  ARGUMENT

## A.  THE STANDARD OF REVIEW

"On a motion to dismiss, the Court accepts as true all factual allegations set out in the Plaintiffs' complaint. See *Lotierzo v. Woman's World Medical Ctr., Inc.* 278 F.3d. 1180, 1182 (11th Cir. 2002)." See *Ham et al. v. city of Atlanta, GA et al.*, Civil Action 1:07-cv-0309-BBM (Order dated July 13, 2007 at 2). Not only must the Court must "accept the facts pleaded…as true," but it must construe them in the light most favorable to the Plaintiff. See *Quality Food de Centro America, S.A. v. Latin American Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983). Given these principles, the Plaintiff's burden on a 12 (b)(6) motion is not severe. As explained in *Ham*, *supra*:

> To survive a motion to dismiss, a complaint need not contain 'detailed factual allegations', but must 'give the defendant fair notice of what the…claim is and the grounds upon which it rests'" . . . The complaint is

-6-

required to contain 'only enough facts to state a claim to relief that is plausible on its face.' *Id*. at 1974." *Id.* at p. 3.

In their motion, Defendants at best play lip service to these principles but do not honor them.

## B.    PLAINTIFFS OWN LEGALLY PROTECTABLE RIGHTS IN THE "RUFFIAN" MARK

Plaintiffs own protectable rights in the "Ruffian" service mark under the Lanham Act ["Act"].  A service mark can be any "word, name, symbol, device or any combination thereof -- (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register ... to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.  This definition is virtually identical to the definition of "trademark," contained in the preceding paragraph of § 1127; the only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services.  *See West & Co., Inc. v. Arica Inst., Inc.*, 557 F.2d 338, 340 n.1 (2d Cir. 1977); *Caesars World, Inc. v. Caesar's Palace*, 490 F. Supp. 818, 822 (D. N.J. 1980).  Service marks and trademarks are governed by identical standards, *West & Co., Inc.*, 557 F.2d at 340, n.1, and thus, like with

-7-

trademarks, common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S. Ct. 357, 60 L. Ed. 713 (1916).

15 U.S.C. § 1125 (a) forbids unfair trade practices involving infringement of service marks, or trademarks, even in the absence of federal trademark registration. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992). The statute is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose. *Montgomery v. Noga*, 168 F.3d 1282, 1300 & n. 29 (11th Cir. 1999). To prevail, a claimant must show (1) it had prior rights to the mark at issue; and (2) the defendant adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two. *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 360 (11th Cir. 1997). Plaintiffs' allegations clearly meet both prongs of this test sufficient to prevail on a motion to dismiss.

The Plaintiffs possess a unique and valuable connection to the Ruffian service mark. (V. Compl. 6, 14, 21). By issuing Notices of Allowance for the subject trademark applications, the PTO signified that it found no prior applications or registrations conflicting with the Plaintiffs applications, that the

applications have complied with all formalities for registration, and that no third parties have objected to registration of the applications.  By approving the Statement of Use, the PTO signified that Plaintiffs have shown use of the mark in commerce.[3]

Defendants seek dismissal of the trademark claims by asserting there has been no actual "use" of the mark because Plaintiffs have not actually made a movie entitled Ruffian or licensed a movie making use of the mark.  Such a restrictive definition of "use," however, is not based on governing legal principles.

In addition to the pendant rights flowing from its federal trademark applications, Plaintiffs claim rights under the common law.  See 15 U.S.C. § 1125 (a).  Under common law, which the Act protects, trademark ownership rights are appropriated through actual "use in commerce."  *Tally-Ho, Inc. v. Coast Cmty College Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989).  The term "use in commerce" in the Act "denotes Congress's authority under the Commerce Clause rather than an

---

[3]  *See* TMEP §1106.01; *see also* TMEP §1109.07  "The examining attorney will examine the specimen to confirm that it shows use as a mark on or in connection with the goods/services identified in the statement of use (*see* TMEP §§1202 *et seq.* and 1301.02 *et seq.*), and will also determine whether the mark shown on the drawing is a substantially exact representation of the mark as used on the specimens (*see* TMEP §§807.12(a) and 1109.12)."

intent to limit the Act's application to profit making activity." *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92-93 (2d Cir. 1997) (citation omitted), *cert. denied,* 523 U.S. 1076, 140 L. Ed. 2d 673, 118 S. Ct. 1521 (1998); U.S. Const., Art. I, § 8, cl. 3.   Because Congress's authority under the Commerce Clause extends to activity that "substantially affects" interstate commerce, *United States v. Lopez*, 514 U.S. 549, 559, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (1995), the Act's definition of "commerce" is concomitantly broad in scope: "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127.[4]

In the service mark context, the Federal Circuit has held that a service mark is different from a mark for goods with respect to "use in commerce."  The legally significant use giving rise to rights in a mark for goods is derived from the placing of the mark in some manner on the goods either directly or on their containers or packaging.   A service mark entails use in conjunction with the offering and

---

[4]  *See also Steele v. Bulova Watch Co.*, 344 U.S. 280, 283-84, 97 L. Ed. 319, 73 S. Ct. 252 (1952); *Larry Harmon Pictures Corp. v. Williams Rest. Corp.*, 929 F.2d 662, 666 (Fed. Cir. 1991) (allowing registration for an intrastate provider of restaurant services with an undefined interstate clientele), *cert. denied,* 502 U.S. 823, 116 L. Ed. 2d 58, 112 S. Ct. 85 (1991).

providing of a service. *See Lloyd's Food Prods, Inc. v. Eli's, Inc.*, 987 F.2d 766, 768 (Fed. Cir. 1993) (citations omitted). Use in advertising can include, for example, "listing the name of the business, including the mark, in telephone directories and placing listings and advertisements in the yellow pages." *Id.*

In *West Florida Seafood, Inc. v. Jet Restaurants, Inc.*, 31 F.3d 1122 (Fed. Cir. 1994), the Federal Circuit emphasized that, in reviewing evidence of "use in commerce" in a service mark case, "one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together establishes prior use." *Id.* at 1125-26. Based on its prior decision in *Lloyd's* --that advertisements may constitute acceptable "specimens" of use – the Federal Circuit in *West Florida* determined that three newspaper advertisements corroborated the plaintiff's prior use assertions when combined with other evidence of state trade name registrations, three regulatory licenses and a state health inspection report listing the service mark. *Id.* at 1126. Significantly, there is nothing in the *West Florida* opinion to indicate whether there were actual sales of services using the service mark in the same time frame of the appearance of the advertising.

Similarly, in *New West Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194 (9th Cir. 1979), the Ninth Circuit held that advertising combined with other non-sales

activity is sufficient to establish use in commerce even if no sales of the services have been made. Specifically, it concluded that, in deciding a question of first use, a court should examine the totality of the parties' activities, a formulation not dissimilar to the Federal Circuit's "jigsaw puzzle" analogy. Although evidence of actual sales is highly persuasive, the question of use adequate to establish appropriation "remains one to be decided on the facts of each case." *Id*. at 1200.

Thus, contrary to Defendants' assertions, the lack of sales or actual licensing of Plaintiffs' rights in a Ruffian film does not determine whether the Defendants have established ownership rights therein. *Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188 (11th Cir. 2001) (party may establish "use in commerce" even in the absence of sales).

The Complaint specifically alleges that the Ruffian mark has been "used in commerce" on multiple occasions. (V. Compl. ¶ 29.) It further provides a number of specifics in this regard, including the marketing of a "Ruffian" film to companies like Turner, HBO and Hennegan Brothers Production Group, retaining an agent to pursue such negotiations, the development of marketing materials and a short movie for the promotion of licensing the rights to "Ruffian," pursuing a

website to generate interest in a "Ruffian" film, and the creation of a Ruffian

Foundation to be a beneficiary of monies earned from the Ruffian mark.[5]

The foregoing activities to promote and license the Ruffian mark by

Plaintiffs in pursuit of the production of motion picture films, television shows and

documentaries constitutes exactly the type of use courts have found to support use

and priority of rights in a service mark. *See e.g., New West Corp. v. NYM Co. of

Calif., Inc.*, supra; *Chance v. Pac-tel Teletrac Inc.*, 242 F.3d 1151 (9th Cir. 2001);

*Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350

(6th Cir. 1998). Moreover, the PTO has found that the Plaintiffs' evidence of use

supported use of the Ruffian service mark in accepting the Statement of Use in

support of its application.[6]

---

[5]There is an amazing irony in Defendants' argument. Given the usurpation and
violation of the Plaintiffs' rights by the Defendants in their production of the
"Ruffian" film, their plans for multiple airings and their DVD sales efforts,
Defendants are responsible for hindering Plaintiffs' efforts bring a "Ruffian" film
to fruition. The market will not easily bear two close-in time competing
productions.

[6]The Second Circuit and other courts have held that PTO determinations, while not
conclusive, are entitled to great weight, *See* MCCARTHY ON TRADEMARKS AND
UNFAIR COMPETITION § 23:84 (4th ed. 2002).

In short, Plaintiffs have more than adequately pled that they have protectable rights in the Ruffian mark and that the mark has been used in commerce.

## C.   DEFENDANTS HAVE INFRINGED PLAINTIFFS' "RUFFIAN" MARK

Plaintiffs assert claims of trademark infringement, dilution and unfair competition.  They allege in their amended complaint the Defendants adopted and used a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.  *See Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, supra.  In determining the likelihood of confusion between the two marks, the Eleventh Circuit established a seven-factor test: (1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion.  *Id; see also Dieter v. B & H Industries of Southwest Florida, Inc.,* 880 F.2d 322, 326 (11th Cir.1989); *Freedom Sav. and Loan Ass'n v. Way,* 757 F.2d 1176, 1182 (11th Cir.), *cert. denied,* 474 U.S. 845, 106 S. Ct. 134, 88 L.Ed.2d 110 (1985).

The Amended Complaint alleges that Plaintiffs own rights in the Ruffian mark for "entertainment services, namely, production of theatrical plays, motion picture films, television shows, and documentaries." (V. Compl. ¶¶3,28). Over Plaintiffs' objections, as illustrated by prior letters and initiation of this litigation, Defendants aired a film titled simply "Ruffian," a title that is obviously identical to the Plaintiffs' mark. (V. Compl. ¶¶ 33, 34). The services, namely production and distribution of films, are identical. Defendants' film was advertised and targeted at the general public, the same market as that intended by the Plaintiffs. Thus, examining all factors in under likelihood of confusion prong, Defendants have clearly infringed the Plaintiffs' rights in the Ruffian mark.

To try to justify their conduct, Defendants try to take refuge in the "fair use" defense. Under 15 U.S.C. § 1115(b) (4), a mark is used only "to describe the goods or services of a party, or their geographic origin, can be permitted." *Id.* However, in order to maintain a fair use defense, a defendant must show each of the following factors:

> (1) The product or service must be one not readily identifiable without use of its trademark;
> (2) only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and

(3) the defendant must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark owner.

*See Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002). *Paccar Inc. v. Telescan Technologies, LLC*, 319 F.3d 243 (6th Cir. 2003).

Defendants cannot satisfy this three-prong test, and certainly not on a 12(b)(6) motion. First, Defendants obviously could have used other words, other than the mark Ruffian to identify their movie. For example, during her career, Ruffian was known as the "Queen of the Fillies." *See* www.wikopedia.com. A movie so titled would have equally referred to the subject of the Defendants' movie; yet it would not infringe on the Plaintiffs' mark.[7]

Second, Defendants prominently and repeatedly promote the names and likenesses of Plaintiffs Whiteley and Vasquez in association with the movie. Indeed - as the DVD cover reveals - the movie was as much about Whiteley as it was about Ruffian, and the prominently features both Whiteley and Vasquez. Neither of these depictions is necessary to promote this movie. Moreover, these

---

[7]*See Playboy Enters., Inc. v. Welles*, *supra* ("The situation with which we are dealing runs afoul of the first requirement for nominative use. Accordingly, we do not consider the other prongs. Defendants could use other words, besides PEI's marks, to trigger adult-oriented banner advertisements.")

depictions clearly are designed to create the impression of endorsement or sponsorship of the Defendants' movie.

In *Kareem Addul-Jabba v. General Motors Corporation*, 85 F.3d 407 (9th Cir. 1996), the Ninth Circuit addressed a comparable issue. General Motors used advertisements including the name of basketball star Kareem Abdul-Jabbar. Rejecting the Defendants' "fair use" defense, court held that a genuine issue of fact existed as to the implied endorsement or sponsorship by Abdul-Jabbar:

> Use of celebrity endorsements in television commercials is so well established by commercial custom that a jury might find an implied endorsement in General Motors' use of the celebrity's name in a commercial....Many people may assume that when a celebrity's name is used in a television commercial, the celebrity endorses the product advertised. Likelihood of confusion as to endorsement is therefore a question for the jury. *White v. Samsung Elec. Am., Inc.*, 971 F.2d 1395, 1400-01 (9th Cir. 1992) (holding that use of a robot dressed and posed like Vanna White next to a "Wheel of Fortune" set raised sufficient question of fact as to endorsement under the Lanham Act to preclude summary judgment), *cert denied*, 508 U.S. 951, 113 S. Ct. 2443, 124 L. Ed. 660 (1993).

Likewise, Defendants' movie includes promotional material and content that created a clear impression of endorsement or sponsorship by the individual Plaintiffs. Defendants have done nothing to dispel this impression, despite repeated requests to add this to the disclaimer. They have not used the words

-17-

"unauthorized," or "fictional," which could dispel the false impression of sponsorship or affiliation by the Plaintiffs.[8]

Finally, the Defendants' attempt to apply *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) is flawed in several important respects. First, the Eleventh Circuit has never adopted *Rogers* or its analysis. *See Club Mediterranee, S.A. v. FOR Searchlight Pictures, Inc.*, 2004 U.S. Dist. LEXIS 3543 (S.D. Fla. 2004) (While applying *Rogers*, court acknowledged that Eleventh Circuit "could reject *Rogers*" the District Court specifically acknowledged and decided the case on alternative grounds). Clearly, this is not an issue for resolution based upon the allegations of the Complaint.

Moreover, even if this Court adopted the *Rogers* analysis, it would then have to determine whether use of the mark as the title misleads as to the source or content of the work. *Rogers v. Grimaldi*, 875 F.2d at 999. Such a determination requires a full analysis of the likelihood of confusion factors set forth in *Frehling Enters. v. International Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

---

[8]*See Paccar Inc. v. Telescan Technologies, LLC*, 319 F.3d at 256 ("Here, Telescan does not include the words like 'independent' or 'unaffiliated' in its domain names to distinguish its web sites. Instead, Telescan's domain names contain the marks 'Peterbilt' and 'Kenworth' unmodified, suggesting that PACCAR is associated with or sponsors the web sites.").

See e.g., *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490, 495 (2d Cir. 1989); *see also Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366 (2d Cir. 1993). While counsel for the Defendants presents conclusory factual allegations on the issue, this intensely factual determination is premature when the parties have not had any opportunity to develop any facts in discovery.[9]

Defendants do not come close to meeting the exacting standards of Rule 12(b)(6) on this issue.

## D.    PLAINTIFFS WHITELEY AND VASQUEZ STATE CLAIMS FOR DEFAMATION

Now that Plaintiffs have been able to see Defendant's Ruffian film, it is clear that they committed defamation and that the Amended Complaint states a claims for defamation. A defamation claim requires proof of four elements: (a) a false and defamatory statement concerning the plaintiff; (b); an unprivileged communication to a third party of that statement (publication); (c) fault by the

---

[9]*See Ocean Bio-Chem v. Turner Network Television, Inc*., 741 F. Supp. 1546, 1552 (S.D. Fla. 1990) ("While first amendment concerns affect application of trademark law, the first amendment does not insulate artistic works from Lanham Act claims. [*cit. omitted*] Thus, [Plaintiff] is not precluded as a matter of law from asserting a Lanham Act claim against use of its trademark associated with a fictional work, and defendants' motion to dismiss plaintiff's complaint must be denied.")

defendant amounting to at least negligence; and (d) special harm or the "actionability of the statement irrespective of special harm." *Bollea v. World Championship Wrestling, Inc.*, 271 Ga.App. 555, 557 (2005).

As to the first element, Plaintiffs allege that Defendants' movie falsely and defamatorily portrays Whiteley as blackmailing Vasquez to ride Ruffian in the match race, and Vasquez being a sort of willing victim in this blackmail. (V. Compl. ¶¶ 42-45). As Plaintiffs allege, these statements directly impugn the Plaintiffs' reputations as horse trainer and jockey, respectively. (V. Compl. ¶45). Defendants' arguments that statements contained in the movie are not susceptible to a defamatory interpretation are unavailing (a) because Defendants brief does not address the statements alleged as defamatory in the Amended Complaint; and (b) because the allegation that one engaged in blackmail or willingly allowed oneself to be blackmailed are easily interpretable as being defamatory.

Indeed, the charge of Whiteley's heavy-handed threat and blackmail is not merely "susceptible of a defamatory interpretation," it is defamatory *per se*. *See Milum v. Banks*, 283 Ga.App. 864, 868 (2007) ("Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality . . . .[and] [b]ribery is such a crime"). The sort of blackmail alleged against Whiteley – essentially threatening

to blacklist Vasquez from ever riding again unless Vasquez rode Ruffian – is, at the very least, immoral within the meaning of *Milum*.[10]

Defendants' also contend that their defamatory statements are "not held out as fact" because of a an alleged "prominent disclaimer that appears at the end of Ruffian." Such an argument is almost insulting, and in any event, rests upon assertions that are properly resolved by the jury.

The so-called "prominent disclaimer"is not prominent at all.[11] It appears for perhaps half a second at the end of all the credits to a movie. The overwhelming majority of viewers will never see any such "disclaimer," and even if they did, not even Evelyn Wood would be able to read it.

In stark contrast to their so-called "disclaimer," Defendants ignore the much more visible claim appearing **on the cover** "Ruffian" DVD case: that the movie is

---

[10]An independent reason why Defendants' treatment of Whiteley and Vasquez in their movie is defamatory *per se* is the fact that, in addition to impugning the Plaintiffs' morality, they are calculated to, and have the effect of, causing serious injury to the Plaintiffs' reputations as horse racing professionals. O.C.G.A. § 51-5-4(a)(3).

[11]Indeed, it is not even a disclaimer. The statement says that the movie is "based on actual facts and events." While it further states that "certain characters, events and conversations" are "fictionalized," no effort is made to tie any of this to Whiteley or Vasquez, who are the main characters in the movie, and whose characters are certainly not "fictionalized."

the "extraordinary **true story**" of the events it depicts.  (V. Compl., Ex. F.)  Many viewers will read the DVD case, never come near the very end of the credits, and come away believing the movie is, as Plaintiffs allege and Defendants themselves advertise, held out as "true."

The second element, unprivileged publication to third parties, is easily met: Defendants advertised, broadcast, and distributed their film to millions of viewers. Defendants do not appear to contend they had any privilege to defame the Plaintiffs, and do not brief the issue.

The third element, fault, is also easily met by the allegations of the Amended Complaint.  Defendants – acting negligently, maliciously, or in reckless disregard of the truth – relied for "facts" exclusively upon Bill Nack, a consulting producer on the film, who was not even present for *any* of the conversations portrayed in the movie and who fabricated from whole cloth nearly all of his information about the Plaintiffs.  (V. Compl. ¶¶ 86, 87).[12]

---

[12]Defendants claim in a footnote on the last page of their Brief, that the Plaintiffs are "probably 'public figures,'" citing *Bartimo v.n Horsemen's Benevolent & Protective Ass'n.*, 592 F.Supp. 1526 (W.D.La. 1984).  For numerous reason, *Bartimo* is not on point - among, them being the fact that the Plaintiffs here have eschewed media attention.  In any event, issues such as this, like so many raised by Defendants, are not properly resolved on a Rule 12(b)(6) motion.

The fourth element, harm, is likewise easily met.  As demonstrated, *supra*, the Defendants' defamatory statements are actionable *per se*, thus obviating the need to plead or prove special damages.  O.C.G.A. § 51-5-4(b).  Additionally, under Georgia law, defamation by broadcast, known as "defamacast," has been held to be actionable *per se*.  *American Broadcasting-Paramount Theatres, Inc. v. Simpson*, 106 Ga.App. 230, 240 (1962) (affirming trial court's denial of demurrers by against the plaintiff's defamacast allegations).  *Simpson* is almost directly on point.[13]

## E.   PLAINTIFFS WHITELEY AND VASQUEZ STATE CLAIMS FOR INVASION OF PRIVACY/FALSE LIGHT

The original complaint asserted a claim for invasion of privacy/false light. The Amended Complaint asserts an additional invasion of privacy tort[14] -

---

[13]The Court held, among other things, that TV defamation, or "defamacast," incorporates elements of both liable and slander, and is "actionable per se." *Id.* at 240.  Interestingly, the Court relied explicitly upon the fact that the defendants were dramatizing a "stale" news event, rather than reporting current events, and that the defendants' dramatization was done entirely for profit, in which case, and that defendants bore the risk under such circumstances.  *Id.* at 239.

[14]"[T]he concept of invasion of privacy encompasses four loosely related but distinct torts, as follows: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation for the defendant's advantage of the plaintiff's name and

-23-

appropriation of Whiteley's and Vasquez' likeness for their own commercial advantage. The allegations of the Amended Complaint plainly state claims with respect to both of these invasion of privacy torts. (V. Compl. ¶¶ 51-60; 91-100). However, only the former will be dealt with here, since that is what has been raised by Defendants in their motion.

In *Ass'n. Services, Inc. v. Smith*, 249 Ga.App. 629, 633, 549 S.E.2d 454, 459 (2001) the Georgia Court of Appeals set forth the elements of a false light claim:

> In a false light case, "[t]he interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation." (Citation and punctuation omitted.) *Cabaniss, supra* at 375(3), 151 S.E.2d 496. Essentially, to establish a claim of false light, a plaintiff must establish the existence of false publicity that "depicts the plaintiff as something or someone which [she] is not." (Citations and punctuation omitted.) *Zarach v. Atlanta Claims Assn.*, 231 Ga.App. 685, 689-690(3), 500 S.E.2d 1 (1998). Next, the plaintiff must demonstrate that "the false light in which [she] was placed would be highly offensive to a reasonable person." (Citation and punctuation omitted.) *Thomason v. Times-Journal*, 190 Ga.App. 601, 604(4), 379 S.E.2d 551 (1989) ( "the hypersensitive individual will not be protected") (citation and punctuation omitted). *See also Brewer v. Rogers*, 211 Ga.App. 343, 350(3), 439 S.E.2d 77 (1993)."[15]

————————————

likeness. [Cit.]" *Troncalli v. Jones*, 237 Ga.App. 10, 13, 514 S.E.2d 478, 482 (1999).

[15]Accord, *Pospicil v. Buying Office, Inc.*, 71 F. Supp. 2d 1346 (N.D. Ga. 1999); *Brewer v. Rogers*, 439 S.E.2d 77 (1993); *Thomason v. Times-Journal, Inc.*, 379

That is precisely what has been alleged in the Amended Complaint.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that Defendants'

Motion to Dismiss be DENIED.

s/ A. Lee Parks
A. Lee Parks
Georgia Bar No. 563750
PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street, 26th Floor
Atlanta, Georgia 30309
(404) 873-8000
(404) 873-8050 (fax)
lparks@pcwlawfirm.com
Attorney for Plaintiffs

---

S.E.2d 551 (1989).

-25-

## <u>Local Rule 7.1D Certification</u>

By signature below, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.


<u>s/ A.Lee Parks</u>
A. LEE PARKS
Georgia Bar No. 563750
Attorney for Plaintiffs


Parks, Chesin & Walbert, P.C.
26th Floor, 75 Fourteenth Street
Atlanta, GA  30309
Telephone: (404) 873-8000,
Facsimile:  (404) 873-8050
E-mail: lparks@pcwfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2007, the within and foregoing Plaintiffs'

Brief in Opposition to Defendants' Amended Motion to Dismiss is served on all

parties by using the CM/ECF system and as follows:

fryan@nixonpeabody.com.

jwargo@wargofrench.com

/s/ A. Lee Parks
A. LEE PARKS
Georgia Bar No. 563750
Attorney for Plaintiffs

Parks, Chesin & Walbert, P.C.
26th Floor, 75 Fourteenth Street
Atlanta, GA  30309
Telephone: (404) 873-8000,
Facsimile:  (404) 873-8050
E-mail: lparks@pcwfirm.com